UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ERIC D. SALES,

                        Plaintiff,

        v.                                              Case No. 23-cv-397-pp

CLYDE JOHNSON, *et al*,

                        Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 29)**

Plaintiff Eric D. Sales—who was incarcerated at the John Burke Correctional Center when he filed this lawsuit, and who is representing himself—is proceeding under 42 U.S.C. §1983 on claims under the Eighth and Fourteenth Amendments against officials at Racine Correctional Institution. Before the court is the defendants' motion for summary judgment. Dkt. No. 29.

**I.    Facts**

        A.    <u>Procedural Background</u>

On March 27, 2023, the court received the plaintiff's complaint asserting claims against Clyde Johnson, allegedly a correctional officer at the Racine Correctional Institution. Dkt. No. 1. The court screened the complaint and allowed the plaintiff to proceed on an Eighth Amendment claim against Johnson. Dkt. No. 6. The court observed that the plaintiff's allegations also suggested that he wanted to bring "a claim under the Due Process Clause of the Fourteenth Amendment," but that it was not clear whether the plaintiff wanted to proceed on that claim or, if he did, against whom. <u>Id.</u> at 5. But the court also explained that even if they had named a defendant, the allegations

"would not state a claim for a Fourteenth Amendment due process violation" because the plaintiff has no "due process right not to be charged with or convicted of a prison disciplinary offense or to remain free from disciplinary segregation." Id. (citations omitted). After the defendant answered the complaint, the court issued a scheduling order setting deadlines for the parties to complete discovery and file dispositive motions. Dkt. No. 10.

On February 8, 2024, the court received the plaintiff's motions to amend his complaint and to extend the parties' discovery deadline. Dkt. Nos. 18, 19. The court granted the motion to extend the discovery deadline and denied without prejudice the motion to amend. Dkt. No. 20. The court allowed the plaintiff to file an amended complaint by April 12, 2024. Id. at 5. The court received the plaintiff's amended complaint on March 20, 2024. Dkt. No. 21. The court screened the amended complaint and allowed the plaintiff to proceed on the same Eighth Amendment claim against Officer Johnson and to proceed on a Fourteenth Amendment claim against Racine Correctional Warden Jason D. Wells "related to Wells allegedly and intentionally delaying [the plaintiff's] appeal of [an] allegedly false conduct report." Dkt. No. 22 at 5–7. The court did not allow the plaintiff to proceed on any other claim under federal or state law. Id. at 7–9.

The Wisconsin Department of Corrections Inmate Locator web site shows that on May 7, 2024, the plaintiff was released from custody to extended supervision. www.appsdoc.wi.gov/lop.details/detail (for "SALES, ERIC D.," Register No. 529483). The plaintiff did not notify the court of his release or file a change-of-address notice with the court. The next day—May 8, 2024— defendant Wells appeared. Dkt. No. 23. The defendants answered the amended complaint on June 26, 2024. Dkt. No. 25. The defendants then asked the court

to extend their deadline for filing dispositive motions, dkt. no. 26; the court granted that motion and extended the parties' dispositive motion deadline to August 9, 2024, dkt. no. 27. On August 9, 2024, the defendants again sought an extension, dkt. no. 28; the court again extended that deadline to August 13, 2024, dkt. no. 35. At the August 13, 2024 deadline, the defendants filed their motion for summary judgment and materials in support. Dkt. Nos. 29–34.

On August 16, 2024, the court issued an order requiring the plaintiff to respond to the defendants' motion by the end of the day on September 12, 2024. Dkt. No. 36. The court advised the plaintiff that

> [i]f the court has not received the plaintiff's written response in opposition to the defendants' summary judgment motion by September 12, 2024, the court has the authority to treat the defendants' motion as unopposed, accept all facts the defendants assert as undisputed and decide the motion based only on the arguments in the defendants' brief, without any input from the plaintiff. That means the court likely will grant the defendants' motion and dismiss the case.

Id. at 2. The court mailed that order to the plaintiff at an address on North 12th Street in Milwaukee (because the plaintiff had not advised the court of his release or a new address, the court located the 12th Street address on a state court case docket for one of the plaintiff's cases).

The September 12, 2024 deadline passed, and the court did not receive the plaintiff's response or an explanation for why he was not able to file it by the deadline. The order the court sent to the plaintiff on North 12th Street was not returned to the court as undeliverable. But on October 16, 2024, the court received from the plaintiff a motion to appoint counsel and a notice that his address had changed to the Milwaukee Secure Detention Facility (MSDF). Dkt. No. 37. In an October 31, 2024 order, the court reviewed this filing and observed that it did not mention the defendants' motion for summary judgment or ask for

additional time to respond to it. Dkt. No. 38 at 1. But because it was unclear whether the plaintiff had received the defendants' motion for summary judgment or the court's order directing him to respond to that motion, the court directed the defendants to resend their summary judgment materials to the plaintiff at MSDF. Id. at 2. The court reminded the plaintiff that in his response, he would need to "support every disagreement with the [defendants'] proposed fact[s] by citing to evidence," which he could provide through "documents that he attaches to his response" or a written declaration or affidavit "telling the court his version of what happened." Id. at 3. The court denied without prejudice the plaintiff's motion for counsel. Id. at 3–4.

On December 2, 2024, the court received the plaintiff's response to the defendants' motion for summary judgment. Dkt. No. 42, 43. The motion has been fully briefed for over a year; the court regrets the time it took to address the motion.[1]

    B.    <u>Factual Background</u>

        1.    *The Amended Complaint*

The court detailed the allegations of the amended complaint in its April 30, 2024, screening order:

> The plaintiff . . . alleges that at around 2:45 p.m. on May 9, 2021, he was using the bathroom in his cell when Johnson opened the cell door and told the plaintiff and his cellmate to come out. The plaintiff says he finished in the bathroom and flushed the toilet, but that Johnson "said [the plaintiff] was putting something down the toilet." Johnson then came into the cell, elbowed the plaintiff in the neck, grabbed him by the sweatshirt and threw him against the wall. The plaintiff says he bumped his head as Johnson was "trying to drag [him] out [of the] cell." The plaintiff says he asked Johnson, "why are you doing this to me?" He claims that Johnson had no reason to

---

[1] The Inmate Locator web site shows that on May 22, 2025, the plaintiff was released from the MSDF. www.appsdoc.wi.gov/lop.details/detail (for "SALES, ERIC D.," Register No. 529483).

rush into the cell while he and his cellmate were inside, and he alleges Johnson did so "without backup." . . . .

The plaintiff asserts that Johnson filed a conduct report "but did not mention the attack or entering [the] cell." The plaintiff wrote to then-Deputy Warden Wells "about the attacke [*sic*] and altercation and to look at the camer's [*sic*]" to see Johnson enter the cell and attack the plaintiff. Wells told the plaintiff that "he would be looking into this matter." . . . .

The plaintiff says that . . . Wells "intentionally delay[ed] [his] appeal of [his] contested hearing form," which the plaintiff says he filed on May 30, 2021 and which Wells received on June 1, 2021. He says that Wells did not "ma[k]e a decision" until October 20, 2021, which the plaintiff says was "well pas[t] [his] 60 day due process deadline." He also alleges that his appeal "'somehow' got missed placed [*sic*]." He says the misplacement of his appeal violated his due process rights . . . .

The plaintiff alleges that on September 14, 2022, Wells sent a memorandum telling the plaintiff that the institution was "unable to locate the appeal which [he] submitted." The plaintiff says he had to resubmit his appeal of his conduct report. He alleges that on January 24, 2023, after filing several institutional complaints, the Office of the Secretary "determined that the conduct report should be expunged due to the lost conduct report appeal and the resultant lengthy delay in responding to it." The plaintiff alleges that the delay led to him serving 120 days in the Restricted Housing Unit "for a violation [he] didn't do." He says it also delayed his "process to petition the Court and preserve relev[a]nt evidence."

Dkt. No. 22 at 3–5 (internal citations omitted).

2.   *Threshold Procedural Issue*

The plaintiff filed a document titled "Plaintiff Eric Sales Response to Defendants' Proposed findings of Fact in Support of Motion for Summary Judgment." Dkt. No. 43. The last paragraph of the document cites 28 U.S.C. §1746, and states, "I verify under penalty of perjury that the statements in this declaration are true and correct and based upon my personal knowledge." Id. at 20. The document is dated November 26, 2024 and is signed by the plaintiff.

Id. The defendants filed seventy-two proposed findings of fact, dkt. no. 31; the plaintiff's response contains seventy-two paragraphs, dkt. no. 43.

In this document, the plaintiff disputes many of the defendants' proposed findings of fact. In support of these disputes, the plaintiff frequently cites "Sales Decl.," making it seem as though he filed a separate affidavit or declaration in support of his response to the defendants' proposed findings of fact. But the plaintiff did not file a separate affidavit or declaration. He filed only two documents—his brief in opposition to the defendants' motion for summary judgment (Dkt. No. 42) and his response to the defendants' proposed findings (Dkt. No. 43).

In their reply brief, the defendants speculate that the plaintiff "may be trying to use his responses to the proposed findings of fact as a sort of declaration, although his responses often include legal arguments." Dkt. No. 44 at 3. They recount that both they and the court gave the plaintiff the text of Fed. R. Civ. P. 56, which requires the non-moving party to support factual assertions by citing to evidence (which can include a declaration or affidavit). Id. The defendants argue that because the plaintiff's response to their proposed findings of fact does not cite to a separate, stand-alone declaration, his response is improper and the court should consider their proposed facts to be undisputed. Id.

The defendants argue a technicality. The plaintiff is not a lawyer. He likely is not aware that an affidavit or declaration may aver only facts, and not legal arguments. He clearly intended his response (Dkt. No. 43) to be an affidavit or declaration, and the court will consider it as such for purposes of this decision. See Owens v. Hinsley, 635 F.3d 950, 954 (7th Cir. 2011) (noting that a "response in opposition to the defendants' motion for summary

judgment" that is verified under §1746 "is equivalent to an affidavit for purposes of summary judgment").

### 3. *The Defendants' Proposed Facts*

At all relevant times, the plaintiff was incarcerated at Racine Correctional. Dkt. No. 31 at ¶1. Johnson was and is employed as a correctional officer at Racine. Id. at ¶2. Wells was deputy warden at Racine from December 23, 2018 through August 15, 2021, when he became warden; he held that position until March 10, 2024. Id. at ¶3.

#### a. Officer Johnson

On May 9, 2021, the plaintiff was housed in general population cell 1213. Id. at ¶4. Officer Johnson avers that he was performing security rounds when he looked into the plaintiff's cell and noticed the plaintiff standing by the television, away from where the toilets are located, and holding what Johnson believed to be a pipe. Id. at ¶5. Johnson avers that incarcerated persons are not allowed to use drugs at Racine and may attempt to do so by rolling an object into a pipe to ingest the drugs. Id. at ¶6. He avers that drug use in prison may be dangerous, causing health or safety issues to prison staff and incarcerated persons. Id. at ¶10. Johnson believed the "pipe" was a rolled-up playing card, and he believed that the plaintiff was attempting to put something inside when Johnson looked into the cell. Id. at ¶7.

Johnson opened the cell door; he avers that when the plaintiff noticed him, the plaintiff "aggressively moved toward the toilet and flushed the object in his hand." Id. at ¶8. Johnson told the plaintiff to give him what was in his hand and to stop what he was doing. Id. at ¶9. He says that the plaintiff moved toward him and tried to block him from entering the cell, repeatedly saying, "Please Johnson, Please Johnson don't take [me] to the hole. I'm trying to see

7

PRC." Id. at ¶11; Dkt. No. 32-2 at 5. Johnson avers that he interpreted the plaintiff's comments to mean that the plaintiff knew that he had done something wrong and that he did not want Johnson to get him in trouble. Dkt. No. 31 at ¶12. Johnson explains that PRC stands for Program Review Committee, from whom an incarcerated person may request early release or reclassification. Id.

Johnson avers that while the plaintiff was blocking him, Johnson had his hands up to protect himself. Id. at ¶13. He says that the plaintiff is larger than he is, and that the plaintiff "appeared intoxicated during this interaction." Id. at ¶14; Dkt. No. 34 at ¶8. He avers that he did not grab the plaintiff, did not push the plaintiff into a wall and did not push his head against a wall. Dkt. No. 31 at ¶¶15–16. Johnson says that because the plaintiff appeared to be intoxicated, Johnson did not want to physically engage the plaintiff out of fear that the plaintiff might harm him. Id. at ¶18. Johnson instead pressed his body alarm to bring additional staff to the cell, then stepped away from the cell while directing the plaintiff and his cellmate to come out. Id. at ¶19. Racine staff placed the plaintiff into temporary lockup. Id. at ¶20.

The plaintiff contests Johnson's version of events. He asserts that he was not holding a pipe and "was useing [sic] the restroom." Dkt. No. 43 at ¶5. He claims that Johnson entered the plaintiff's cell in retaliation because Johnson did not find drugs during a previous cell search. Id. The plaintiff says that he "was standing in front of the toilet" when he asked Johnson why Johnson had entered the cell. Id. at ¶7. The plaintiff claims that he "had to[o] much to loose [sic] and n[o]thing to gain from useing [sic] drugs." Id. He disputes telling Johnson not to send him to the hole and says he did not block Johnson from coming into his cell. Id. at ¶11. The plaintiff says that he did nothing wrong

and that Johnson "violated [him] over and over." Id. at ¶12.The plaintiff says that his cellmate and Sergeant Aaron Grau witnessed Johnson "attacking [the plaintiff] in [his] cell" by grabbing the plaintiff's shirt and pushing him against a wall, causing him to hit his head. Id. at ¶¶13, 16. The plaintiff disputes that he was intoxicated and claims that officers drug tested him (and that he was clean) before placing him in temporary lockup. Id. at ¶14.

After removing the plaintiff, staff searched his cell and confiscated from near the television stand papers that Johnson suspected were the drug K2. Dkt. No. 31 at ¶21. Johnson gave those papers to his captain for testing and had no further involvement with them. Id. at ¶22. Racine staff later confirmed that the papers were "consistent with K2 paper that has been found in" the prison. Dkt. No. 32-1 at 8, 14. During the cell search, staff also noticed that the electrical outlet by the door was "blackened and burnt out," which Johnson explains could suggest that the plaintiff and his cellmate were "arcing." Dkt. No. 31 at ¶23. (Johnson does not explain what "arcing" is or why the plaintiff and his cellmate would be doing it.) Johnson reiterates that he believed that the plaintiff was attempting to use or already had used intoxicants, which violates prison rules. Id. at ¶24 (citing Wis. Admin. Code §DOC 303.43). Johnson wrote the plaintiff a conduct report for possession of intoxicants. Id.; Dkt. No. 32-1 at 5. He submitted the conduct report for supervisor approval and had no further involvement with it. Dkt. No. 31 at ¶25.

The plaintiff disputes that the confiscated papers were his and says they were located near his cellmate's television stand. Dkt. No. 43 at ¶21. He says that his cellmate "told [e]verybody that the paper they found was his paperwork," but he claims that "the paper was never tested by any kind of ES lab." Id. The plaintiff says that all electrical outlets in every cell in which he had

been housed at Racine were "blackened and burnt out." Id. at ¶23. He disputes ever smoking or seeing "intoxicants in [his] cell" and reiterates that "[t]he paper they found was [his] cellmate['s] paper work" that was not tested or sent "to any lab." Id. at ¶24.

On June 2, 2021, the plaintiff submitted an administrative complaint claiming that Johnson had attacked him for no reason, grabbed him by the arm and pulled him out of his cell. Dkt. No. 31 at ¶26; Dkt. No. 32-5 at 11. Because of this complaint, Racine began an employee investigation into Johnson's actions on May 9, 2021. Dkt. No. 31 at ¶27; Dkt. No. 32-2. A lieutenant and a captain interviewed Johnson about the incident on June 4 and July 6, 2021. Dkt. No. 31 at ¶28; Dkt. No. 32-2 at 5–6, 17–18. Johnson avers that he was required "to provide truthful and thorough responses" during those interviews. Dkt. No. 34 at ¶33. Wells avers that as part of the investigation, he contacted the security director and had her pull all incident reports and video footage of the alleged incident. Dkt. No. 33 at ¶21. The security director reported her findings to Wells based on the video of the incident, which a captain summarized in an email. Id. at ¶23; Dkt. No. 32-2 at 24. The captain explained that he had "reviewed the camera footage for the day and you are unable to see the cell door of the [incarcerated person] in question. [The captain] was not able to see any incident of the officer entering the cell at any time." Dkt. No. 32-2 at 24. On July 30, 2021, Johnson received a letter from the interim warden stating that no further action would be taken against him regarding the May 9, 2021 incident, "based upon all the information gathered during the investigation," and the investigation was closed. Dkt. No. 31 at ¶30. Johnson did not face any disciplinary action for the May 9, 2021 incident. Id. at ¶31.

A complaint examiner dismissed the plaintiff's administrative complaint based on the ongoing investigation of the incident. Dkt. No. 32-5 at 2–3. The plaintiff appealed that dismissal, but the Office of the Secretary also dismissed the appeal because of the ongoing investigation. Id. at 6–7.

b.    Warden Wells

Wells avers that between 2020 and 2022, "staffing levels at Racine were in constant flux due to staff being out ill, leaving their positions, or changing offices." Dkt. No. 31 at ¶32. He says that as a result, "some appeals to conduct reports [were] misplaced or lost completely." Id. He explains that this "was not done intentionally" but was a result of "too many officers handling the appeals" and high turnover within the offices. Id. at ¶34. In August 2022, Wells became aware that these appeals were misplaced or lost. Id. at ¶33. He says that he worked with the administrators at the Division of Adult Institutions to correct the problem and to provide incarcerated persons another opportunity to submit an appeal. Id. at ¶36.

On September 14, 2022, the prison sent a memorandum about the issue "to those impacted." Id. Wells's office also instituted additional measures to ensure that no further appeals were misplaced or lost. Id. at ¶¶37–40. Wells says these measures "helped streamline the process and ensure there were no further lost appeals." Id. at ¶41. Wells avers that he faced an internal investigation about the lost or misplaced appeals and received "a non-disciplinary letter of expectation" about the issue and his tenure as warden. Id. at ¶42.

The plaintiff disputes Wells's version of the facts and claims that Wells "had 60 day time limit in accordance with DOC 303.83 but violated [the plaintiff's] due-process." Dkt. No. 43 at ¶33. The plaintiff says, without elaboration, that Wells knew "way before September 14, 2022 about [the

plaintiff's] error two time's before it came to the third Due-process violation." Id. at ¶36.

Wells avers that the plaintiff received a conduct report based on the May 9, 2021 incident with Officer Johnson. Dkt. No. 31 at ¶48. This was conduct report #165486. Id.; Dkt. No. 32-1 at 5. Racine officials held a hearing on May 27, 2021, during which they found the plaintiff guilty of possession of intoxicants, imposed 120 days' disciplinary separation and provided the plaintiff written notice of the decision. Dkt. No. 32-1 at 13–14.

On May 30, 2021, while he was serving his sentence of disciplinary separation, the plaintiff submitted an appeal of conduct report #165486. Id. at 10; Dkt. No. 33 at ¶29. The received date on the appeal is June 1, 2021, dkt. no. 32-1 at 10, but Wells avers that this "was one of the conduct reports appeals that was misplaced or lost," dkt. no. 33 at ¶27. He says that he "did not intentionally misplace [the plaintiff's] appeal of Conduct Report 165486." Id. at ¶28. Wells avers that he spoke with the plaintiff in late summer or early fall 2021, and that the plaintiff told Wells that the plaintiff had submitted an appeal for a conduct report and had not yet received a decision. Id. at ¶30. Wells says that this conversation was when he first learned that the plaintiff had submitted the appeal. Id. at ¶32. Wells avers that he told the plaintiff to resubmit his appeal, and that Wells would review it. Id. at ¶31. He says that he did not intentionally delay a decision on the appeal but simply had not yet seen and reviewed it. Id. at ¶33.

Wells avers that the plaintiff resubmitted his appeal for conduct report #165486. Id. at ¶34. Wells does not cite any evidence in support of this fact, and it does not appear that this document is in the record. Id. But the plaintiff does not contest this statement. Dkt. No. 43 at ¶57. On October 20, 2021, Wells

issued a decision acknowledging that the appeal was outside the timeframe allowed under §DOC 303 and returning the conduct report to a hearing officer for a rehearing. Dkt. No. 33 at ¶¶35–36; Dkt. No. 32-1 at 9. The rehearing was held on November 15, 2021, and Racine staff again found the plaintiff guilty of possession of intoxicants and again imposed 120 days' disciplinary separation. Dkt. No. 33 at ¶60; Dkt. No. 32-1 at 7–8. Wells avers that this disposition was effective from the date of the original finding of guilt (May 27, 2021), so after the rehearing, the plaintiff did not serve additional time in disciplinary separation for this conduct report. Dkt. No. 33 at ¶38. Wells says that this conviction did not extend the plaintiff's overall incarceration and only transferred him "to a more restrictive housing setting within the institution." Id. at ¶39. The plaintiff's record from the conduct report shows that he did not lose any earned good time because of the disciplinary conviction. Dkt. No. 32-5 at 15–16. The plaintiff does not contest that the conviction did not extend the duration of his incarceration but says that he "was transfer[r]ed to [a] lesser restrictive housing setting." Dkt. No. 43 at ¶62.

Wells avers that in September 2022, the plaintiff "would have received" the memorandum that Wells sent to all incarcerated persons informing them about lost or misplaced appeals and giving them an opportunity to reappeal their conduct reports. Dkt. No. 33 at ¶40; Dkt. No. 32-6 at 15. Wells says that he believes that the plaintiff again resubmitted his appeal of conduct report #165486 in September 2022. Dkt. No. 33 at ¶41. The document he cites is dated September 25, 2021, but the date on the "received" stamp is September 28, 2022. Dkt. No. 32-6 at 17–18. Wells also points out that this appeal refers to his October 20, 2021 decision ordering the rehearing for the conduct report, suggesting that it is misdated and that it was filed in September 2022. Dkt. No.

33 at ¶41; Dkt. No. 32-6 at 17. On October 13, 2022, Warden Dylon Radtke (not a defendant) reviewed the plaintiff's resubmitted appeal and issued a decision affirming the hearing officer's decision from the November 15, 2021 rehearing. Dkt. No. 33 at ¶42; Dkt. No. 32-1 at 1. This decision also reflects the "date appeal received" as September 28, 2022. Dkt. No. 32-1 at 1.

The plaintiff agrees that he did receive a memorandum, but he says it told him that he "had 15 days to reappeal or it will be dissmissed [*sic*]." Dkt. No. 43 at ¶63. The plaintiff says that an inmate complaint examiner "told [him] to reappeal and if the Warden Wells don[']t respond in two mouths [*sic*] let him [k]now." Id. The plaintiff says that he "let three mouth's [*sic*] go buy [*sic*]," after which the complaint examiner "told [him] that Mr. Wells violated [his] Due-process for the 3rd or 4th time and to [write] the Office of the Secretary." Id.

On October 24, 2022, the plaintiff filed an administrative complaint claiming that he did not receive a response to his appeal for "over a year" but that he did receive the memorandum in September 2022 about lost or misplaced appeals. Dkt. No. 32-6 at 13. A complaint examiner recommended affirming the complaint "to acknowledge a procedural error" in violation of §DOC 303. Id. at 3. Warden Steven Johnson accepted that recommendation and affirmed the complaint. Id. at 4. The plaintiff nonetheless appealed, and the Office of the Secretary affirmed the appeal and gave him a copy of Radtke's October 13, 2022, decision. Id. at 7. The Office of the Secretary also expunged conduct report #165486 "due to the lost conduct report appeal and the resultant lengthy delay in responding to it." Id. at 8.

Wells maintains that he did not intentionally delay the appeal process for conduct report #165486. Dkt. No. 33 at ¶44. He reiterates that he believes the plaintiff's appeal was one of the appeals "misplaced or lost due to systematic

issues." Id. The plaintiff contests this and says that Wells "intentionally delayed [his] appeal by knowing there was a problem but never doing anything about it" and instead "Blaming it was a Systematice [*sic*] issue." Dkt. No. 43 at ¶67.

c.    Conduct Report #168287

On May 25, 2021, just over two weeks after the incident with Johnson, the plaintiff received conduct report #168287 for multiple violations, including using intoxicants. Dkt. No. 31 at ¶69; Dkt. No. 32-7 at 1. This conduct report was based on another officer observing the plaintiff smoking in his cell on May 25, 2021. Dkt. No. 32-7 at 1. The plaintiff did not contest this conduct report and on June 2, 2021, Racine staff found him guilty and imposed 120 days' disciplinary separation. Dkt. No. 31 at ¶71; Dkt. No. 32-7 at 1. The plaintiff does not dispute that he did not previously contest this conduct report but he claims that his cellmate "was cutting the light on and off," and that "the wall c[a]ught on fi[re]." Dkt. No. 43 at ¶70. He says that "[n]o officer or officers never seen [him] smokeing [*sic*] nor being high." Id.

Wells avers that regardless of whether conduct report #165486 (the incident with Johnson) resulted in the loss of the plaintiff's minimum-security classification status, the plaintiff would have spent time in disciplinary separation and faced the same status change based on conduct report #168287 about smoking in his room, which he received only a few weeks later. Dkt. No. 33 at ¶49. The plaintiff does not contest Wells's assertion but reiterates his allegation that Johnson "violated [his] Eighth Amendment by useing [*sic*] excessive force and then Falsified [his] conduct ticket." Dkt. No. 43 at ¶72.

**II. Discussion**

    A.    Summary Judgment Standard

A party is entitled to summary judgment if he shows that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

    B.    Legal Standards

        1.    *Eighth Amendment*

As the court explained in the first screening order, the Eighth Amendment governs the plaintiff's claim that Johnson used excessive force. Dkt. No. 6 at 4 (citing Wilson v. Seiter, 501 U.S. 294 (1991)). An Eighth Amendment claim consists of an objective and a subjective component. Farmer v. Brennan, 511 U.S. 825, 834 (1994). In the context of the plaintiff's claim of excessive force, he must present evidence demonstrating that "(1) 'the alleged wrongdoing was objectively harmful enough to establish a constitutional violation,' and (2) 'the officials act[ed] with a sufficiently culpable state of mind.'" Dkt. No. 6 at 4

16

(quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 8 (1992) (internal quotation omitted)). The court explained in the first screening order that the "'core judicial inquiry' is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" <u>Id.</u> (quoting <u>Hudson</u>, 503 U.S. at 6; and citing <u>Whitley v. Albers</u>, 475 U.S. 312, 320–21 (1986)).

2.    *Fourteenth Amendment*

The Fourteenth Amendment governs the plaintiff's claim that Warden Wells intentionally delayed processing his appeal from his conduct report, in violation of his right to due process. <u>See</u> <u>Wolff v. McDonnell</u>, 418 U.S. 539, 563–66 (1974). But the "Due Process Clause of the Fourteenth Amendment applies only to deprivations of life, liberty, and property." <u>Isby v. Brown</u>, 856 F.3d 508, 524 (7th Cir. 2017). To succeed on this claim, the plaintiff must present evidence showing that "(1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient." <u>Scruggs v. Jordan</u>, 485 F.3d 934, 939 (7th Cir. 2007) (citing <u>Rowe v. DeBruyn</u>, 17 F.3d 1047, 1053 (7th Cir. 1994)).

The court explained in the second screening order that the plaintiff does not have a due process right to appeal his prison disciplinary conviction. Dkt. No. 22 at 6 (citing <u>Wolff</u>, 418 U.S. at 564–66; and <u>Lowe v. Stockey</u>, 36 F. App'x 353, 360 (10th Cir. 2002)). But he does have a liberty interest in his good-time credits "and thus must be afforded due process before prison officials interfere with those rights." <u>Scruggs</u>, 485 F.3d 939 (citing <u>Montgomery v. Anderson</u>, 262 F.3d 641, 644–45 (7th Cir. 2001); and <u>Meeks v. McBride</u>, 81 F.3d 717, 719 (7th Cir. 1996)). The court allowed the plaintiff to proceed on a limited claim "related to Wells allegedly and intentionally delaying his appeal of the allegedly false conduct report, which the plaintiff says 'set [him] back' with good time

17

credits and extended his release date." Dkt. No. 22 at 7 (citing <u>Wolff</u>, 418 U.S. at 558; and <u>Montgomery</u>, 262 F.3d at 644.[2]

C.     <u>Analysis</u>

1.     *Officer Johnson – Eighth Amendment Claim*

The parties provide two versions of the events underlying the plaintiff's Eighth Amendment claim, and those versions differ in nearly every respect. The amended complaint alleges that the plaintiff was using the restroom in his cell when Johnson barged in, ordered the plaintiff and his cellmate out and then attacked the plaintiff when the plaintiff refused to comply. In his response to the defendants' proposed facts—which he swore under penalty of perjury was true—the plaintiff maintains this version of events and claims that Johnson came into his cell to retaliate against him because Johnson did not find contraband during a previous cell search. The plaintiff reiterates that he was using the bathroom and not doing anything wrong. He says that his cellmate and a sergeant saw Johnson attack the plaintiff and that they could testify in support of his version of events. He denies being intoxicated at the time, denies having anything in his hand to use as a pipe and says that the papers that staff confiscated and tested for drugs were not his and that they belonged to his cellmate, who admitted that the papers were his.

Officer Johnson avers that as he was performing security rounds, he saw the plaintiff in his cell with what he believed to be a pipe. He says that the

_____

[2] The court explained that the plaintiff could be barred from seeking damages based on his contention that the conduct report related to the incident with Officer Johnson was falsified, because he had not alleged that that conduct report was invalidated before he brought this lawsuit. Dkt. No. 22 at 7, n.1 (citing <u>Edwards v. Balisok</u>, 520 U.S. 641, 646 (1997); and <u>Heck v. Humphrey</u>, 512 U.S. 477, 486 (1994)). The undisputed evidence shows that the Office of the Secretary expunged this conduct report. Dkt. No. 32-6 at 8. That means that <u>Heck</u> does not bar the plaintiff's challenge related to this conduct report.

plaintiff was not in the bathroom or near the toilet at that time. He says that he opened the plaintiff's cell door to question the plaintiff about the supposed pipe and an object that the plaintiff was placing into the pipe. The plaintiff then rushed to the bathroom to flush the pipe, despite Johnson's orders to stop and to give him the object. Johnson says that the plaintiff then moved toward him and tried to block Johnson from entering the cell, imploring Johnson not to send the plaintiff to disciplinary segregation because he was seeking early release. Johnson says that he was concerned that the plaintiff was intoxicated, so he put up his hands to protect himself before backing away from the cell and pressing his body alarm to call for other officers. Johnson avers that he did not grab or push the plaintiff. Other officers came to the cell and escorted the plaintiff to temporary lockup. The prison investigated the incident, eventually concluding that Johnson had not violated institution rules and would face no discipline.

A reasonable jury could believe either version of the events. It could believe the version the plaintiff alleged in his amended complaint and reiterated in his summary judgment response: that Johnson came into his cell without reason, attacked him and fabricated the story about the pipe. A reasonable jury also could discredit the amended complaint and instead believe Johnson's version of events: that he saw the plaintiff with what appeared to be a pipe, attempted to ask the plaintiff about the item and backed away when the plaintiff appeared intoxicated and begged Johnson not to send him to the hole.

The parties' conflicting accounts of the events creates a genuine dispute of fact on the plaintiff's Eighth Amendment claim. The court cannot determine which version of the events is the correct one. That is for a jury to decide. See Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 704–05 (7th Cir.

2011) ("[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." (quotation marks and internal citations omitted)). The court must deny summary judgment for Johnson.

2. *Warden Wells – Fourteenth Amendment Claim*

It is undisputed that staffing at Racine was a challenge from 2020 to 2022, and that some appeals from conduct reports were reported lost or misplaced. But there is no evidence that staff—including Wells—intentionally misplaced any appeal from a conduct report, including the plaintiff's. The undisputed evidence shows that Wells was not made aware of the misplaced or lost appeals until August 2022. Wells sent a memorandum to affected incarcerated persons in September 2022.

The evidence also shows that Wells learned of the plaintiff's lost appeal much earlier and took steps to remedy the issue. On May 27, 2021, staff found that on May 9, 2021, the plaintiff had been guilty of possession of intoxicants (conduct report #165486); staff imposed 120 days' disciplinary separation. The plaintiff appealed but did not receive a response. Wells spoke with the plaintiff a few months later, and the plaintiff told Wells that he had not received a decision on his appeal from conduct report #165486. Wells told the plaintiff to resubmit his appeal, which the plaintiff did, and Wells ordered a rehearing on the conduct report because his decision was outside the timeframe allowed under administrative code. At the rehearing, staff again found the plaintiff guilty and imposed the same 120 days' disciplinary separation, effective May 2021. The plaintiff did not serve any additional time in disciplinary separation from the rehearing.

The evidence does not support a finding that the plaintiff was denied due process for a protected liberty or property interest. As the court explained in both screening orders, the plaintiff "does not 'have a due process right not to be charged with or convicted of a prison disciplinary offense or to remain free from disciplinary segregation.'" Dkt. No. 22 at 6 (quoting Dkt. No. 6 at 6; and citing Wolff, 418 U.S. at 564–71; and Sandin v. Conner, 515 U.S. 472, 484 (1995)). Time in disciplinary separation was the only consequence of the plaintiff's disciplinary conviction. Contrary to his allegations, there is no evidence that this conviction extended his release date or affected his earned good time. That means he was entitled to only notice of the charges and an opportunity to present his version of events, which it is undisputed he received. See Adams v. Reagle, 91 F.4th 880, 895 (7th Cir. 2024) (citing Westefer v. Neal, 682 F.3d 679, 684–85 (7th Cir. 2012)).

As explained above, the plaintiff also had no protected right to appeal his disciplinary conviction. See Wolff, 418 U.S. at 564–66; Lowe, 36 F. App'x at 360. But even if he did, there is no evidence that he was denied that right. It is undisputed that the delay in processing the plaintiff's appeal from his disciplinary conviction was a result of staffing issues, not intent or malice by Wells. The plaintiff claims that Wells intentionally delayed his appeal, but he has identified no evidence supporting that claim and has no personal knowledge about Wells's intent. The plaintiff's unsupported speculation about the delay in processing his appeal does not create a genuine dispute of fact that may defeat summary judgment. See Jones v. Van Lanen, 27 F.4th 1280, 1286–87 (7th Cir. 2022); Fed. R. Civ. P. 56(c)(4) and Fed. R. Evid. 602.

In his response brief, the plaintiff reiterates that his delayed appeal delayed his transfer to Felmers O. Chaney Correctional Center, where he was

able to obtain a job. Dkt. No. 42 at 10. This echoes an argument from the plaintiff's original complaint. Dkt. No. 1 at 4. As the court explained in the first screening order and reiterated in the second, "the plaintiff 'has no Fourteenth Amendment property or liberty interest in a prison job, so the inability to obtain a prison job because of the conduct report does not state a due process claim.'" Dkt. No. 22 at 6 (quoting Dkt. No. 6 at 5–6; and citing Harris v. Fleming, 839 F.2d 1232, 1237 n.5 (7th Cir. 1988); Garza v. Miller, 688 F.2d 480, 485–86 (7th Cir. 1982); and Olson v. Humphreys, Case No. 07-C-682, 2007 WL 2570231, at *4 (E.D. Wis. Aug. 30, 2007)). The plaintiff similarly has not stated, and is not proceeding on, a claim about his delayed appeal affecting or delaying his ability to obtain a job.

At most, the delay in processing the plaintiff's appeal violated the Wisconsin Administrative Code requiring the warden to review an appeal from a contested disciplinary disposition within sixty days. See Wis. Admin. Code §DOC 303.82(2). But a violation of prison policy alone does not violate the Constitution. Courtney v. Butler, 66 F.4th 1043, 1052–53 (7th Cir. 2023). Moreover, Wells corrected the issue by allowing the plaintiff to resubmit his appeal and by timely reviewing that appeal; he decided the resubmitted appeal in the plaintiff's favor and ordered a rehearing on the plaintiff's conduct report.

The undisputed evidence also shows that in September 2022, after Wells sent out the memorandum about the lost or misplaced appeals, the plaintiff again was able to contest his disciplinary conviction from conduct report #165486. After the rehearing, the warden affirmed the plaintiff's conviction, and the plaintiff filed an administrative complaint about his delayed appeal. The Office of the Secretary expunged conduct report #165486 because of the procedural errors—not based on a finding that the plaintiff did not commit the

violation. That the conduct report was expunged does not mean that the plaintiff has a claim about the 120 days he spent in disciplinary segregation. It is undisputed that the plaintiff received another conduct report on May 25, 2021, just over two weeks after the May 9, 2021 incident with Johnson. Racine staff found the plaintiff guilty of two violations and imposed the same 120 days' disciplinary separation. Although the plaintiff now insists that that conduct report was false, he did not challenge the conduct report or his disciplinary sentence in 2021. The undisputed evidence shows that even if the plaintiff had not received a conduct report for the incident with Johnson, he would have received the same punishment, status change and relocation to disciplinary housing in May 2021 based on the May 25 incident.

The undisputed evidence would not allow a reasonable jury to conclude that Wells intentionally delayed the plaintiff's appeal from his May 9, 2021 disciplinary conviction or that the delay extended the plaintiff's release date or affected his earned good time. Wells is entitled to judgment as a matter of law on the plaintiff's Fourteenth Amendment claim.

        3.   *Qualified Immunity*

The defendants assert that even if there is a dispute of fact whether either defendant violated the plaintiff's constitutional rights, they are entitled to qualified immunity. Dkt. No. 30 at 17–19. They assert that it is not clearly established that Johnson "used excessive force when he perceived that [the plaintiff] was smoking and attempted to stop the activity." Id. at 18. The defendants assert that Johnson did not act "'maliciously and sadistically for

the very purpose of causing harm,'" so he is entitled to qualified immunity.[3] Id. (quoting Whitley, 475 U.S. at 320).

Qualified immunity "'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Figgs v. Dawson, 829 F.3d 895, 905 (7th Cir. 2016) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted)). Qualified immunity is an affirmative defense. To defeat the defendant's assertion of qualified immunity, the plaintiff must show that 1) the defendants violated his constitutional right and 2) the right at issue was clearly established at the time of the violation. Pearson, 555 U.S. at 232. If the plaintiff fails to satisfy either inquiry, then the defendant is entitled to qualified immunity. See Muhammad v. Pearson, 900 F.3d 898, 904 (7th Cir. 2018) (citing Gibbs v. Lomas, 755 F.3d 529, 537 (7th Cir. 2014)).

As the court explained above, a reasonable jury could believe either Johnson's or the plaintiff's version of the events. For purposes of qualified immunity, the court views the evidence in the light most favorable to the plaintiff because he is the nonmoving party. See Rainsberger v. Benner, 913 F.3d 640, 647 (7th Cir. 2019). If a jury believed the plaintiff's version of the events, then it could find that Johnson entered the plaintiff's cell because he was upset that he did not previously find contraband, falsely claimed that the plaintiff was smoking and used that false narrative to attack the plaintiff and cause him

---

[3] Because the court is granting summary judgment to Warden Wells on the merits, he "does not need qualified immunity.'" Sierra-Lopez v. Brown County, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (quoting Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

injury. It would be reasonable for a jury to conclude that Johnson's use of force was unnecessary and excessive in violation of the plaintiff's Eighth Amendment rights. It has long been established that a correctional officer may not use force against an incarcerated person without reason and to cause harm. See, *e.g.*, Hudson, 503 U.S. at 7; Whitley, 475 U.S. at 320–21. Because that is exactly what the plaintiff alleges Johnson did here, and a because reasonable jury could believe that version of events, Johnson is not entitled to qualified immunity.

## III. Conclusion

The court **GRANTS IN PART** and **DENIES IN PART** the defendants' motion for summary judgment. Dkt. No. 29.

The court **GRANTS** the motion as it relates to the plaintiff's Fourteenth Amendment claim against Warden Wells and **ORDERS** that Warden Wells is **DISMISSED** as a defendant in this case.

The court **DENIES** the motion as it relates to the plaintiff's Eighth Amendment claim against Officer Clyde Johnson.

The court **ORDERS** that the remaining parties must appear for a telephonic status/scheduling conference on **February 9, 2026 at 11:00 AM**. The parties are to appear by calling the court's conference line at 551-285-1373 and entering Meeting ID 161 4901 8989 and Passcode 190021 when prompted.

Dated in Milwaukee, Wisconsin this 29th day of December, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**